**STATE**

v.

**Stanley BANACH.**

**No. 93–598–C.A.**

Supreme Court of Rhode Island.

Oct. 27, 1994.

Jeffrey Pine, Atty. Gen., Jane McSoley, Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Catherine Gibran, Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the appeal of the defendant, Stanley Banach, from judgments of convictions entered in the Superior Court of second-degree murder and of carrying an unlicensed pistol. The defendant contended on appeal that the trial justice erroneously denied his motion for a new trial. After considering the defendant's arguments, we deny his appeal and affirm the judgment of the Superior Court.

### FACTS AND PROCEDURAL HISTORY

Shortly after midnight on April 30, 1992, Anthony Rosa (Rosa), his younger half-brother, Jason Otero (Otero), and Rosa's girlfriend, Jenny Traskauskas (Traskauskas), left the brothers' home on Coggeshall Street in Providence, Rhode Island. Concerned about the woman's safety at that late hour, the brothers, according to Otero, decided to walk her to her home on Felix Street, approximately one mile away. The three walked to Douglas Avenue, then to Ruggles Street. At the corner of Smith and Ruggles Streets, the brothers, notwithstanding their apparent concern for her safety, said good night to Traskauskas, who continued, ostensibly alone, down Ruggles Street towards her home, about one and one-half blocks away. Otero testified that Rosa suspected the woman of infidelity, and therefore, in order to observe whether she in fact returned home or instead went off to another man, the brothers followed her at a distance sufficient to escape notice, down Chalkstone Avenue until she entered her house on Felix Street.

Their surveillance completed, Rosa and Otero took a different, indirect route back home, walking down Chalkstone Avenue, onto Oakland Avenue. At the corner of Oakland and Higgins Avenues, Rosa crossed the street toward a man later identified as defendant. Otero waited at the corner, about fifteen feet away. Soon after Rosa approached defendant, Otero heard a clicking noise and then a shot. After Rosa collapsed to the ground, defendant fled, and Otero ran to nearby houses to enlist help. Rosa was transported to Rhode Island Hospital, where

he was pronounced dead fourteen hours later.

Six days after the shooting, defendant was arrested following Otero's identification of defendant in a photo array. From the outset, defendant admitted having shot Anthony Rosa but maintained that he did so in self-defense.

The testimony regarding the events that led up to the shooting varied widely at trial before a jury. The state's primary witness, Otero, testified that Rosa had initially approached defendant on Oakland Avenue because Rosa believed defendant was a friend of his named "Tom–Tom." Rosa directed Otero to wait at the corner, then crossed the street to greet defendant. Because the area was lit by a street lamp, Otero was able to see defendant's face clearly enough to realize that the man was not Tom–Tom. Otero testified on direct examination that he heard defendant say, "Stop," to his brother, but on cross-examination he stated that he was not sure who had spoken. Otero testified that at that point he heard the click and saw his brother put his hands over his head, as if to protect himself. Otero further testified that after defendant had shot his brother, Otero ran toward the fallen body, whereupon defendant pointed the gun at Otero and said he had "another one" for him. But then defendant fled, and Otero ran to get help.

At trial, defendant told a story considerably different from Otero's. The defendant testified that while walking on Smith Street, he had noticed two people following him. Alarmed, he testified that he ran around the corner on Pleasant Valley Parkway to a bush, under which he had hidden a gun earlier that day. The defendant stated that although he had never owned or used a gun before, he had stolen one from gang members for whom he worked because he feared the gun would be used on him in retaliation for defendant's earlier testimony as a state witness against certain of the gang members. On appeal, defendant conceded that he had spun a "tall tale" concerning how he had obtained the gun because he feared that the jury would perceive him as a "pistol packing hoodlum."

The defendant testified that after retrieving the gun, he found the two stalkers near the corner of Garfield Avenue, the street where he lived. He stated that he began to walk down Oakland Avenue, then turned onto Higgins, where he heard one of his followers say, "Come here." Not recognizing the person, defendant testified that he cautiously approached the figure who had spoken. The stranger twice demanded defendant's distinctive and expensive goose-down jacket, and defendant twice refused. According to defendant, as the stranger, Rosa, approached, Rosa stuck his hands into his pants, and as he pulled them out, defendant became "real scared," fearing that the stranger was drawing a weapon. In defendant's words, "I pulled out my gun and just pointed and fired not knowing what I was doing."

In rebuttal, the state called two of defendant's acquaintances who testified that they had seen defendant with the murder weapon months before the shooting. Both witnesses testified that defendant had shown the gun to them and had fired it on at least two previous occasions.

On February 1, 1993, a jury found defendant guilty of second-degree murder in violation of G.L.1956 (1981 Reenactment) § 11–23–1, as amended by P.L.1990, ch. 284, § 4 and of carrying a pistol without a license in violation of G.L.1956 (1981 Reenactment) § 11–47–8, as amended by P.L.1991, ch. 227, § 1. On February 12, 1993, prior to sentencing, defendant moved for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. The defendant argued that the jury's verdict was contrary to law and contrary to the evidence presented at trial. The trial justice denied the motion and sentenced defendant to life imprisonment for the murder and to a five-year concurrent sentence on the weapons conviction. In response, defendant filed the instant appeal pursuant to G.L.1956 (1985 Reenactment) § 9–24–32.

## DEFENDANT'S MOTION FOR A NEW TRIAL

 The standard for our review of a trial justice's ruling on a motion for a new trial under Rule 33 of the Superior Court Rules of Criminal Procedure is well settled.

In deciding a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence. *State v. Marini*, 638 A.2d 507, 515 (R.I.1994). *See also Ruggieri v. The Big G Supermarkets, Inc.*, 114 R.I. 211, 330 A.2d 810 (1975). Specifically, the trial justice has at least three analyses to perform when ruling on a motion for a new trial. *State v. Bertram*, 591 A.2d 14, 29 (R.I.1991). In the first analysis, the trial justice must consider the evidence in light of the charge to the jury, a charge that is presumably correct and fair to the defendant. *State v. Girouard*, 561 A.2d 882, 890–91 (R.I.1989). In the second analysis, the trial justice must determine his or her own opinion of the evidence. The trial justice must then weigh the credibility of the witnesses and other evidence and choose which conflicting testimony and evidence to accept and which to reject. *Id.* at 891. In the third analysis, the trial justice must determine, by an individual assessment of the evidence and in light of the charge to the jury, whether the justice would have reached a different result from that of the jury. *Id.* When, after reviewing the evidence, the trial justice agrees with the jury's verdict, the analysis is complete and the verdict should be affirmed.[1] *Marini*, 638 A.2d at 515–16.

In cases in which the trial justice has articulated a sufficient rationale for denying a motion for a new trial, the decision will be given great weight. Such a judgment will be disturbed only if the trial justice has overlooked or misconceived material evidence relating to a critical issue or if the justice was otherwise clearly wrong. *State v. Robbio*, 526 A.2d 509, 513 (R.I.1987). *See also State v. Caruolo*, 524 A.2d 575, 585 (R.I. 1987). The record should reflect a few sentences of the justice's reasoning on each point. *Girouard*, 561 A.2d at 890. In providing a rationale for a decision, however, the trial justice need not refer to all the evidence supporting the decision but need only cite evidence sufficient to allow this court to discern whether the justice has applied the appropriate standards. *State v. Barnes*, 122 R.I. 451, 458, 409 A.2d 988, 992 (1979). Moreover, the moving party bears the burden of convincing this court that the trial justice did not conscientiously apply these standards. *State v. DaRocha*, 121 R.I. 182, 185, 397 A.2d 500, 502 (1979).

After a careful review of the record before us, we conclude that the trial justice in the instant case did engage in a complete and proper analysis while fulfilling his role as the thirteenth juror. The trial justice reviewed the physical evidence presented at trial and independently assessed the credibility of the witnesses. *See State v. Vanasse*, 593 A.2d 58, 68 (R.I.1991). Furthermore, the record reflected his reasoning on each point. In denying defendant's motion for a new trial, the trial justice stated, "I am totally satisfied here that this jury took the instructions that I had given to them, understood those instructions, and applied them to the facts that they found to have been proven by the state by evidence and proof beyond a reasonable doubt * * *. The jury's verdict was a proper verdict. Any other jury verdict would have been a total mischaracter [*sic*] of justice." Thus, we conclude that the trial justice performed all the procedural analyses required of him in rejecting defendant's motion for a new trial.

Nevertheless, defendant argued that the trial justice misconceived material evidence and was clearly wrong when he performed these analyses and concluded as he did, because, defendant contended, with one exception, his testimony was more logical and coherent than Otero's testimony. Therefore, defendant maintained, the trial justice's decision should be reversed because, absent Otero's testimony, the state presented no credible proof of the elements of second-degree murder. We disagree.

1. In cases in which the trial justice does not agree with the jury, the judge must make one further analysis. In this fourth analysis, the trial justice must then determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice. If the verdict does meet this standard, the trial justice may grant a new trial. However, in those cases wherein the trial justice determines that the evidence and the reasonable inferences drawn therefrom are so nearly balanced that reasonable individuals could differ, the motion for a new trial will be denied. *State v. Girouard*, 561 A.2d 882, 891 (R.I.1989). If the trial justice and the jury reach the same conclusion, as in the instant case, the fourth analysis is precluded.

The defendant alleged that a new trial should be granted because the trial justice was erroneously swayed into disbelieving the entire version of events as described by defendant because of the patent unbelievability of what defendant conceded was his "stupid gun story." The defendant argued that if the story of how he obtained the gun were deleted from his testimony, his version of the events was "inherently more believable than was Jason Otero's." By focusing on the fanciful aspects of defendant's gun story, defendant asserted, the trial justice ignored some of the more unlikely aspects of Otero's testimony.

 The defendant, then, did not allege that the trial justice failed to comply with the requisite procedure for considering a motion for a new trial but challenged, rather, the justice's determination of the credibility of witnesses. This court has expressly held that it is the task of the trial justice to determine whether the evidence presented is sufficiently credible to warrant a new trial. *Fontaine v. State,* 602 A.2d 521, 524 (R.I. 1992). Once such a determination has been made, "[t]his court will not disturb the decision of a trial justice * * * unless that decision was clearly wrong or unless the trial justice, in reviewing the evidence, overlooked or misconceived relevant and material evidence." *Id.* at 525; *see also State v. Feng,* 421 A.2d 1258, 1273 (R.I.1980). We must determine, therefore, whether the trial justice was clearly wrong in finding Otero's testimony believable and defendant's unbelievable.

 In the instant case, the trial justice was presented with conflicting testimony, unsupported by corroborating witnesses. The defendant did not prove that the trial justice was clearly wrong in his assessment of the credibility of defendant and Otero. Given Otero's close proximity to the shooting, the physical evidence, the damage done to defendant's credibility by his "stupid gun story," as well as such intangible factors as demeanor, we cannot say that the trial justice's determination was clearly wrong. *Caruolo,* 524 A.2d at 586. A trial justice is under no obligation to sift through a witness's testimony and discard only those portions that are patently unbelievable. Rather, the trial justice "believed one set of facts and disbelieved

the other," and made "sound credibility findings by assessing the facts and the totality of the circumstances before him." *Fontaine,* 602 A.2d at 526.

In asking this court to weigh the testimony and determine the credibility of the witnesses, defendant essentially argued that the trial justice should have believed his testimony rather than the testimony of the state's witnesses. "Such an argument is appropriate in a trial court but not in this court." *Doyle v. State,* 430 A.2d 416, 418 (R.I.1981) (citing *State v. Chatell,* 121 R.I. 528, 531, 401 A.2d 436, 438 (1979)).

Thus defendant has failed to demonstrate that the trial justice was clearly wrong in his assessment, and consequently, we affirm the trial justice's denial of defendant's motion for a new trial. *Fontaine,* 602 A.2d at 526.

## PROOF OF SECOND–DEGREE MURDER

 The defendant next argued that the credible evidence adduced at trial failed to prove beyond a reasonable doubt all the elements of second-degree murder under § 11–23–1 and that consequently, a new trial should be granted. Under the statute, murder in the second degree requires an intentional killing, though the formation of the intent need only be momentary. *State v. Grabowski,* 644 A.2d 1282, 1285 (R.I.1994) (citing *State v. Fenik,* 45 R.I. 309, 315, 121 A. 218, 221 (1923)). Murder in the second degree requires that the state must prove beyond a reasonable doubt only that the defendant unlawfully killed the deceased with malice. *State v. Mattatall,* 603 A.2d 1098, 1106 (R.I.), *cert. denied,* —— U.S. ——, 113 S.Ct. 117, 121 L.Ed.2d 74 (1992). *Accord United States v. Lame,* 716 F.2d 515, 518 (8th Cir. 1983). Malice can be inferred from the attending circumstances that surround a defendant's conduct and from the very nature of the killing itself, including the use of a deadly weapon. *Mattatall,* 603 A.2d at 1106. "When the duration of the defendant's formation of intent to kill is insufficient to support a conviction of first-degree murder, a finding of second-degree murder is often appropriate." *Grabowski,* 644 A.2d at 1285.

The defendant contended that the state produced no credible evidence of malice or premeditation in defendant's actions. He argued that having been followed through dark city streets and having been approached by a threatening figure determined to steal his jacket, his sole intent in shooting Rosa was self-defense. The defendant also asserted that even if his reaction was disproportionate to the threat posed by the victim, the most serious crime of which he could be convicted was voluntary manslaughter, not second-degree murder. We disagree.

The defendant's arguments rest upon a view of the evidence supported only by defendant's testimony. As noted above, the trial justice found defendant's entire testimony to lack credibility and stated, "I'm satisfied that this defendant simply lied to the jury. He came here and committed perjury. It's just a liar trying to avoid responsibility for a willful and deliberate killing. * * * I'm satisfied that the jury followed my instructions on the law in the findings of murder. I'm satisfied that they properly applied the facts finding that the killing was of less than a momentary duration."

The trial justice, then, chose to believe Otero's testimony that the defendant suddenly and without provocation shot Rosa. As a consequence of accepting Otero's version of the shooting, the trial justice and the jury were justified in finding beyond a reasonable doubt that the defendant had intentionally killed the victim with malice aforethought and that this intent had existed for a very brief time only. The evidence presented by the state showed that the defendant shot the victim with no provocation after a chance encounter. Then, after threatening the victim's brother, he fled and was arrested six days later. The defendant did not report the shooting to the police during that time. The trial justice pointed out that the defendant's activities after the shooting were not consistent with those of a man who had acted justifiably in self-defense. Furthermore, although the defendant testified that the gun he had used to kill Rosa had not been his, the trial justice noted persuasively that the defendant, in describing the shooting, referred to "*my* gun." The state also presented witnesses who confirmed the defendant's familiarity with guns and his propensity to fire

them. Thus the trial justice reasonably concluded from the evidence that the defendant had murdered Rosa. Because the trial justice was not clearly wrong, his findings will not be disturbed on appeal. *Robbio,* 526 A.2d at 514.

Accordingly, we deny and dismiss the defendant's appeal and affirm the judgment of conviction of the Superior Court, to which we remand the papers of this case.